IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **RICHARD ALLEN SEABOLT**, | : | Case No.5:13-CV-02516 |
| Plaintiff, | : | |
| v. | : | |
| **CAROLYN W. COLVIN**, | : | **MAGISTRATE'S REPORT AND** |
| Acting Commissioner of Social Security, | | **RECOMMENDATION** |
| | : | |
| Defendant. | | |

### I. INTRODUCTION.

This case was automatically referred to the undersigned Magistrate Judge for report and recommendation pursuant to Local Civil Rule 72.2 for the United States District Court, Northern District of Ohio. Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying his claims for Disability Insurance Benefits (DIB)[1] made pursuant to Title II of the Social Security Act (Act) and Supplemental Security Income (SSI)[2] made pursuant to Title XVI of the Act. Pending are the parties' Briefs on the Merits (Docket Nos. 14 and 15). For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

---

[1] Eligibility for DIB benefits depends on the co-existence of two prerequisite conditions: disability and insured status. *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997). A claimant must be disabled on or before the date his or her insured status expires. *Id.*

[2] The SSI program provides disability payments to the aged, blind, and disabled if they meet certain income eligibility standards. 42 U.S.C. §§ 1381–1383 (Thomson Reuters 2014).

## II. PROCEDURAL BACKGROUND.

Plaintiff completed applications for DIB and SSI on August 13, 2010, alleging that his disability began and he became unable to work on March 18, 2009 (Docket No. 13, pp. 142-144, 150-154 of 409). Following the administrative denials upon initial review and reconsideration (Docket No. 13, pp. 83-91, 93-101, 104-112, 113-115, 116-118, 125-127, 129-130, 131-133, 135-137 of 409), Plaintiff requested a hearing (Docket No. 13, pp. 138-139 of 409). On May 11, 2012, Administrative Law Judge (ALJ) Virginia M. Robinson conducted a hearing at which Plaintiff, represented by counsel, and Vocational Expert (VE) Michele Edge, a Vocational Rehabilitation Counselor for the Ohio Rehabilitation Services Commission, appeared and testified (Docket No. 13, pp. 33, 140-141 of 409). ALJ Robinson rendered an unfavorable decision on July 16, 2012 (Docket No. 13, pp. 25-36 of 409). Plaintiff's counsel presented a brief and medical records dated March 6, 2012 through April 26, 2012, to the Appeals Council (Docket No. 13, pp. 10, 395-409 of 409). The Appeals Council reviewed the ALJ's action, findings and conclusions and "looked" at the records submitted directly to the Appeals Council. On September 10, 2013, the Appeals Council denied Plaintiff's request for review (Docket No. 13, pp. 5-7 of 409). Plaintiff filed a timely Complaint in the United States District Court for the Northern District of Ohio to challenge the denial of benefits (Docket No. 1).

## III. FACTUAL BACKGROUND.

The following is a summary of the testimony presented by Plaintiff and the VE at the administrative hearing.

### A. PLAINTIFF'S TESTIMONY.

Plaintiff was 51 years of age. He had been in the United States Air Force for 14 years and when the military downsized, he was discharged and given severance pay (Docket No. 11, pp. 48-49

2

of 409). In 2009, Plaintiff was employed as a mechanic at Alexander Mill Services Group, a mold casting, separation processing and reclamation services plant. In performing his work, he stood and walked the entire day, occasionally lifting up to 100 pounds. Plaintiff left this job when he became concerned about further damage caused to his lungs by exposure to silica dust (Docket No. 13, pp. 49-51 of 409).

Plaintiff was also employed as a mechanic at White Acre Greer Company, a manufacturer of brick pavers. In this capacity, he recalled lifting "many heavy items." Eventually, he was promoted to shift supervisor (Docket No. 13, pp. 51-52 of 409). Before working at White Acre, Plaintiff was employed through Manpower® as a mechanic. He worked for three years before being hired by East Manufacturing Corporation (EMC), a manufacturer of aluminum tractor trailers (Docket No. 13, pp. 52-53 of 409). Plaintiff was released from employment at EMC while tending to a family emergency (Docket No. 13, pp. 53-54 of 409). During the same year he was discharged from EMC, Plaintiff was hired by Ronald D. England, Sr., to help pour concrete. He described pouring concrete as "the hardest job in the world" (Docket No. 13, p. 54-55 of 409).

Plaintiff described himself as a stay-at-home-boyfriend. He took care of "domestic things" such as household chores, laundry and meals. He performed these tasks at his pace, taking a break when necessary (Docket No. 13, pp. 55-56 of 409).

Turning to his impairments, Plaintiff explained that he had (1) chronic obstructive pulmonary disease (COPD), (2) chronic upper respiratory disease, (3) a pinched nerve, (4) neck and low back pain and (5) right-hand numbness. Plaintiff did not walk much anymore due to the unpredictable nature of onset paralysis in his legs. Consequently, he was limited to walking no more than 300 feet before taking a break. Plaintiff's impairments relegated him to completing tasks that did not require

3

repetitions with his hands or elevating his hands above his head. Plaintiff could, however, sit for any long period of time (Docket No. 13, pp. 57-58, 59, 62 of 409). His impairments were aggravated by smoking and extreme temperatures (Docket No. 13, pp. 58-59 of 409).

Plaintiff claimed that the pharmacological interventions for prevention of pain were ineffective. He used his inhaler more than four times daily to facilitate breathing. A side effect of these treatments was fatigue (Docket No. 13, pp. 59-60 of 409).

### B. THE VE TESTIMONY.

The VE reviewed the record and confirmed that her testimony was consistent with the information contained in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a United States Department of Labor publication that organizes jobs in the United States economy based on their similarities and defines the structure and content for performance of all listed occupations (Docket No. 13, p. 64 of 409; 1991 WL 654964 (4th ed. 1991)). The VE reviewed the exhibits in Plaintiff's file and upon clarifying his employment as a tailgate installer, classified Plaintiff's past relevant work with the exception of the job as installer of tailgates by (1) job title, (2) the level of physical exertion; and (3) specific vocational preparation (SVP), an estimate of the amount of lapsed time a typical worker could learn the techniques, acquire the information and develop the facility for average performance of the listed jobs:

| (1) POSITION<br>DOT REFERENCE | (2) LEVEL OF PHYSICAL EXERTION | (3) SVP |
|---|---|---|
| Maintenance Mechanic<br>638.281-014 | Heavy level of exertion involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. 20 C.F.R. §§ 404.1567(d), 416.967(d). | 7–Over two years and up to and including 4 years.<br>Www.onetonline.org/help/online/svp |
| Construction Worker<br>905.663-014 | Very heavy level of exertion involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. 20 C.F.R. §§ 404.1567(e), 416.967(e). | 2–Anything beyond a short demonstration up to and including one month. |

(Docket No. 13, p. 66 of 409).

The ALJ posed the *first* hypothetical:

Consider a hypothetical individual with Plaintiff's age, education and work background. Assume that the hypothetical individual can perform light work but only occasionally climbing ramps or stairs, but never climbing ladders, ropes and scaffolds, occasionally stooping, kneeling, crouching and crawling, avoid concentrated exposure to extreme cold and extreme heat, humidity. . . . And avoid concentrated exposure to workplace hazards such as dangerous machinery and unprotected heights but avoid even moderate exposure to pulmonary irritants or respiratory irritants such as fumes, odors, dust, gases. With these limitations, could Plaintiff perform any of his past work?

The VE opined that based on this hypothetical, the individual could not perform any of Plaintiff's past work. However, there were other jobs that a person with those limitations could after a short demonstration and up and including one month, learn the techniques, acquire and develop the facility to perform. The number of jobs suggested by the VE that are available in Ohio and the nation are:

| POSITION & DOT | STATE OF OHIO | NATION |
|---|---|---|
| Mail Clerk DOT 209.687-026 | 5,000 | 100,000 |
| Marker DOT 209.587-034 | 70,000 | 1,500,000 |
| Routing Clerk DOT 222.687-022 | 30,000 | 500,000 |

(Docket No. 13, pp. 67-68 of 409).

The ALJ posed the *second* hypothetical that had the same limitations as the first except that the hypothetical individual would perform the work sitting or standing and he or she would not be off task more than 10% of the day. The VE explained that the DOT did not consider a sit/stand option but using her experience and training, the aforementioned light exertional jobs could be performed with a sit/stand option (Docket No. 13, pp. 68, 71 of 409).

The ALJ posed a *third* hypothetical that required the VE to assume that the hypothetical individual was limited to sedentary exertional level work and that the jobs performed would have all of the prior limitations except for being able to sit/stand, occasionally climb stairs, never climb ladders, ropes scaffolds and be prepared to perform the job after a short demonstration and after one month.  The VE posed the following jobs and provided the numbers of jobs available in the State of Ohio and the Nation:

| POSITION AND DOT | STATE OF OHIO | NATION |
| --- | --- | --- |
| Addresser<br>DOT 209.587–010 | 2,500 | 140,000 |
| Surveillance System Monitor<br>DOT 379.367-010 | 2,500 | 140,000 |
| Ticket Checker<br>DOT 219.587-010 | 60,000 | 1,100,000 |

(Docket No. 13, pp. 68-69 of 409).

The ALJ posed a *fourth* hypothetical:

> . . . . going back to hypothetical number two, [and imposing all of the limitations there] but in addition the hypothetical person had limitations handling and fingering limited to "frequent" as defined in the Act.  Would there be jobs available with that additional limitation?

The VE explained that the surveillance system monitor and addresser would accommodate these limitations.  The mail clerk, the marker and routing clerk jobs would require frequent handling and fingering (Docket No. 13, p. 70 of 409).

Finally, the VE responded that the hypothetical individual could not sustain employment if he or she needed to take unscheduled breaks during the day, resulting in being off task 20% of the time (Docket No. 13, pp. 70-71 of 409).

#### IV. MEDICAL EVIDENCE PRESENTED TO THE COMMISSIONER.

Dr. Jean D. Dib, M. D., a specialist in internal medicine, treated Plaintiff from early 2005 though mid-January 2009.  www.healthgrades.com/physician/dr-jean-dib.

| | |
|---|---|
| April 11, 2005 | Started Plaintiff on a beta blocker used to treat individuals suffering from chest pain and hypertension (Docket No. 13, p. 373 of 409). |
| January 20, 2006 | Started Plaintiff on medication used to treat pneumonia and hypertension (Docket No. 13, p. 372 of 409). |
| January 26, 2006 | Supplemented Plaintiff's drug therapy in an attempt to control hypertension (Docket No. 13, p. 371 of 409). |
| February 8, 2006 | Plaintiff's hypertension remained uncontrolled and the dosage of medication was increased accordingly (Docket No. 13, p. 370 of 409). |
| February 9, 2006 | Plaintiff's chest X-ray was normal (Docket No. 13, p. 369 of 409). |
| February 15, 2006 | Continued drug management for acute rhinosinusitis which was improving (Docket No. 13, pp. 367-368 of 409). |
| September 3, 2008 | In response to Plaintiff's excessive weight loss, full and complete laboratory work was ordered (Docket No. 13, p. 362 of 409). |
| December 16, 2008 | Diagnosed and treated Plaintiff for an acute upper respiratory infection (Docket No. 13, p. 360 of 409). |
| December 30, 2008 | Diagnosed Plaintiff with a hyperactive airway disease, ordered further tests and started Plaintiff on a prednisone taper for a week (Docket No. 13, p. 359 of 409). |
| January 15, 2009 | Attributed the hyperinflation of Plaintiff's lungs to emphysema or asthma (Docket No. 13, p. 357 of 409) |
| January 23, 2009 | Added Spiriva, a bronchodilator, and Symbicort, an asthma medication, to Plaintiff's drug regimen (Docket No. 13, p. 356 of 409). |

Plaintiff presented to the Alliance Community Hospital on January 27, 2008, with severe abdominal pain.  Diagnosed with a small bowel obstruction, internal hernia, a congenital adhesion and mild diverticulosis, Plaintiff underwent surgery on the following day to relieve the bowel obstruction (Docket No. 13, pp. 303-311 of 409).

A pulmonary function test was administered on January 14, 2009 and the results showed that Plaintiff had severe obstructive lung disease (Docket No. 13, pp. 391-394 of 409).

The strategy for conducting a chest study on April 23, 2010, was to form a basis for measuring change over a period of time.  This baseline study confirmed the presence of COPD

7

(Docket No.13, p. 222 of 409).

On April 23, 2010, health technician Pamela Holbein reviewed and updated Plaintiff's allergies consistent with protocol and screened Plaintiff for post traumatic stress disorder. The results of the test were negative (Docket No. 13, pp. 299-300 of 409). On April 26, 2010, Plaintiff was started on an antihistamine (Docket No. 13, pp. 294-297 of 409).

On May 4, 2010, the results from the ankle/brachial index, a test done by measuring blood pressure at the ankle, showed the highest systolic blood pressure of both upper extremities was in the left arm (Docket No. 13, pp. 301-302 of 409). Results from the test administered on May 13, 2010, showed a high systolic blood pressure in both upper extremities (Docket No. 13, pp. 249-250 of 409).

Plaintiff underwent a vascular lab study on May 22, 2010. The waveforms in both arms were within normal limits at rest (Docket No. 13, p. 248 of 409).

Dr. Parwaiz Sheikh, a specialist in internal medicine, reviewed Plaintiff's medications on May 25, 2010, and found that (1) his hypertension was well controlled, (2) Plaintiff used "rescue Albuterol" but he continued to smoke, (3) that there was evidence of poor circulation, and (4) he had sensation of tingling, tickling, prickling, pricking, or burning of his skin on the right, likely carpal tunnel syndrome (Docket No. 13, pp. 284-285 of 409; www.healthgrades.com/physician/dr-parwaiz-sheikh).

On August 23, 2010, diagnostic studies were completed of Plaintiff's lumbosacral spine, thoracic spine and cervical spine. The results from the lumbosacral spine study showed degenerative changes L5-Sl and exaggerated pelvic tilt (Docket No. 219-220 of 409). The results from the study of the thoracic spine showed no significant abnormality of the vertebral bodies, preserved disc spaces and no evidence of fracture (Docket No. 14, pp. 220-221 of 409). The results from the cervical spine

study showed moderate degenerative changes at C4-C5, C5-C6, C6-C7 and no evidence of fracture (Docket No. 13, pp. 221-222 of 409).

On September 16, 2010, Mr. Frank A. Lingel, a certified physician assistant, conducted a pharmacological review in which he added a non-steroidal anti-inflammatory drug to assist with the neck pain and a vaccine for treatment of emphysema (Docket No. 13, pp. 279-281, 282- of 409).

Mr. Lingel referred Plaintiff to physical therapy on October 12, 2010, and completed a pharmacological review on October 29, 2010.  Christopher Wood conducted the physical therapy consultation on November 8, 2010, instructing Plaintiff on the effective use of the TENS unit and exercise (Docket No. 13, pp. 243-245, 276-278 of 409; www.healthgrades.com/provider/frank-lingel).  On November 29, 2010, Plaintiff's medications were subject to pharmacological review and he was treated for symptoms of sinusitis.  Plaintiff reported to the physical therapist that he had been performing the home exercises without increased symptoms but without improvement (Docket No. 13, pp. 272-274 of 409).

On December 20, 2010, Renee U. Garono, a physical therapist, noted that Plaintiff had attended four sessions and he still had decreased flexibility and range of motion.  The TENS unit helped when used consistent with its instructions (Docket No. 13, p. 270 of 409).

Mr. Lingel diagnosed and treated Plaintiff for acute bronchitis on December 30, 2010 (Docket No. 13, pp. 266-269 of 409).  Also, on December 30, 2010, Plaintiff underwent an electrocardiogram and the results showed normal sinus rhythm and the presence of dead, dying or decaying heart tissue (Docket No. 13, pp. 237-238 of 409).

On January 4, 10, 24, and 31, 2011, Plaintiff participated in physical exercises designed to decrease neck pain.  At the end of these sessions, he was without subjective improvement (Docket

No. 13, pp. 262-265 of 409).

Plaintiff was re-evaluated for physical therapy on February 14, 2011. Physical therapist Sharon Huchko determined that Plaintiff was no better since initial evaluation despite complaints of reduced pain after two thoracic mobilizations. Ms. Huchko referred Plaintiff back to a physician to conduct further diagnostic/interventions for this diagnosis secondary to patient not progressing towards his goals (Docket No. 13, pp. 260-262 of 409).

Licensed practical nurse (LPN) Valerie R. Turner, reviewed Plaintiff's medications and conducted tobacco counseling on February 28, 2011 (Docket No. 13, pp. 258-260 of 409).

Dr. Ramsey N. Saad, a specialist in anesthesiology, conducted a consultation on March 31, 2011. After considering Plaintiff's personal history, medical history and diagnostic evidence, Dr. Saad discussed various treatment options including epidural injections and nerve blocks and authorized an order for two prosthetics: a "waterbase pillow" and a neck rest pack (Docket No. 13, pp. 220-235 of 409; www.healthgrades.com/physician/dr-ramsey-saad).

On March 31, 2011, registered nurse (RN), Lawrence Logsdon, explained critical information about pain management (Docket No. 13, p. 251 of 409).

Dr. Saad administered an epidural steroid injection on April 29, 2011 (Docket No. 13, pp. 352-355 of 409).

Plaintiff presented for treatment of dull pain on July 14, 2011. LPN Ann E. Persons administered a corticosteroid hormone used to decrease the body's immune response and reduce symptoms such as swelling (Docket No. 13, pp. 348-350 of 409).

On August 26, 2011, Plaintiff underwent a nerve block treatment (Docket No. 13, pp. 312-314 of 409).

10

Radiographs from August 23, 2011 and August 30, 2011 were compared with the MRI of the lumbar spine taken on September 20, 2011. The results showed the following:

1. Diffuse disc bulge with left far lateral bulging disc indenting the exiting nerve root at L3-L4 level.
2. Focal annular tear with small central disc herniation (Docket No. 13, pp. 314-316 of 409).

The MRI of the lumbar spine administered on September 10, 2011, showed degenerative changes of the upper and mid cervical spine as described, most pronounced at C4-C5 and C5-C6 where there was mild to moderate narrowing of the canal and moderate narrowing of the foramina (Docket No. 13, pp. 335-336 of 409).

Mr. Lingel conducted a medication review on January 17, 2012. Review included education on the effective use of medication (Docket No. 13, pp. 326-329 of 409).

On February 9, 2012, Plaintiff had a visit with the pain management clinic via video conference. He complained of low back pain radiating to the posterior aspect of the right lower extremity to the undersurface of his toes. Upon reviewing Plaintiff's medical record, discussion was had regarding epidural steroid injections (Docket No. 13, pp. 323-326 of 409).

Dr. Saad administered another injection on February 24, 2012 (Docket No. 13, pp. 383-384 of 409).

### V. MEDICAL EVIDENCE PRESENTED TO THE APPEALS COUNCIL.

On March 5, 2012, Plaintiff called complaining that he was experiencing fever and chills, a cough and shortness of breath. Registered nurse Charles Erwin advised Plaintiff to (1) stay indoors, (2) drink plenty of fluids, (3) rest and (4) proceed to the emergency room if the symptoms became more intense (Docket No. 13, pp. 408-409 of 409.

Plaintiff's drug therapy was adjusted to included treatment for a chronic cough on March 6,

11

2012 (Docket No. 13, pp. 406-408 of 409).

On March 8, 2012, the results of the MRI of the thoracic spine showed:

(1) Normal thoracic "kyphotic curvature." Small marginal osteophytes in lower thoracic region but no significant spinal canal or foramina stenosis at any level.
(2) The thoracic spinal cord is normal in shape, size and signal intensity. The cord ends at Tl2-Ll level. Pre and paravertebral soft tissues in the thoracic region are normal.

(Docket No. 13, p. 390 of 409).

On April 26, 2012, Mr. Lingel conducted a pharmacological review. No changes were made to the medication regimen (Docket Nol 13, pp. 401-404 of 409).

### VI. LEGAL FRAMEWORK FOR EVALUATING DISABILITY CLAIMS.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)). The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical. *Id.*

When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step analysis set forth in 20 C.F.R. §§ 404.1520, 416.920. *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 512 (6th Cir. 2010).

> First, a claimant must demonstrate that he or she is not currently engaged in substantial gainful employment at the time of the disability application. *Id.* (*citing* 20 C.F.R. § 404.1520(b)). Second, the claimant must show that he or she suffers from a severe impairment. *Id.* (*citing* 20 C.F.R. § 404.1520(c)). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is

expected to last for at least twelve months, which meets or equals a listed impairment, he or she will be considered disabled without regard to age, education, and work experience. *Id.* (*citing* 20 C.F.R. § 404.1520(d)). Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and the claimant has a severe impairment, the Commissioner will then review claimant's residual functional capacity (RFC) and relevant past work to determine if he or she can do past work; if so, he or she is not disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(e); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 238 (6th Cir.2002)). If the claimant's impairment prevents him or her from doing past work, the analysis proceeds to the fifth step where the Commissioner will consider the claimant's RFC, age, education and past work experience to determine if he or she can perform other work. *Id.* If the claimant cannot perform other work, the Commissioner will find him or her disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(f)).

### VII. THE ALJ'S DECISION.

Upon careful consideration of the entire record, ALJ Jordan made the following findings:

1. Plaintiff met the insured status requirements of the Act through December 31, 2014. Plaintiff had not engaged in substantial gainful activity since March 18, 2009, the alleged onset date.
2. Plaintiff had the following severe impairments:
   a. Degenerative disc disease of the cervical and lumbar spines.
   b. COPD.
3. Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part. 404, Subpart P, Appendix 1.
4. After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity to perform light work except that he required a sit stand option that allowed him to sit or stand alternatively provided that he was not off task more than ten percent (10%) of the work period. He could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds. He could occasionally stoop, kneel, crouch, and crawl. He could occasionally reach overhead, and he could frequently handle. He must avoid concentrated exposure to extreme cold, heat, and humidity and he must avoid moderate exposure to pulmonary irritants such as fumes, odors, dust, and gases. He must avoid concentrated exposure to workplace hazards, such as dangerous machinery and unprotected heights.
5. Plaintiff was unable to perform any past relevant work.
6. Plaintiff was a younger individual with at least a high school education and was able to communicate in English. Given Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.
7. Plaintiff had not been under a disability as defined in the Act from March 18, 2009 through the date of the decision on July 16, 2012 (Docket No. 13, pp. 25-36 of 409).

### VIII. THE LEGAL FRAMEWORK FOR JUDICIAL REVIEW.

In a social security appeal, the Court's inquiry is limited to determining whether the ALJ's non-disability finding is supported by substantial evidence. *Roberts v. Commissioner of Social Security*, 2014 WL 1123564, *1 (S.D.Ohio,2014) (*citing* 42 U.S.C. § 1383(c)(3); *Bowen v. Commissioner of Social Security*, 478 F.3d 742,745–46 (6th Cir.2007)). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Richardson, supra*, at 1420; *Ellis v. Schweicker*, 739 F.2d 245, 248 (6th Cir.1984)). Substantial evidence is more than a mere scintilla, *Id.* (*citing Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir.1988); *NLRB v. Columbian Enameling and Stamping Company*, 59 S.Ct. 501, 505 (1939), rather, substantial evidence must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. *Id.* (*citing LeMaster v. Secretary of Health and Human Services*, 802 F.2d 839, 840 (6th Cir.1986) (*quoting NLRB, supra*).

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Id.* (*citing Hephner v. Mathews*, 574 F.2d 359 (6th Cir.1978); *Ellis, supra*; *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536 (6th Cir.1981); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir.1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir.1984)). The Court may not try the case de novo, resolve conflicts in evidence or decide questions of credibility. *Id.* (*citing Garner, supra*). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the Court as a trier of fact would have arrived at a different conclusion. *Id.* (*citing Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir.1981)).

## IX. ANALYSIS.
## I.

Plaintiff's first argument concerns the ALJ's residual functional capacity finding. In particular, the ALJ failed to consider uncontroverted evidence that he does not retain the capacity to stand or walk consistently with the light exertional level.

Defendant argues that the ALJ who evaluated Plaintiff's claim reasonably determined that given his functional abilities, Plaintiff could perform a modified range of unskilled, light work that included a sit/stand option and postural and environment limitations.

**A**.   **THE LAW**

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." POLICY INTERPRETATION RULING TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96–8p, 1996 WL 374184 *2 (July 2, 1996). A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. *Id*. It thus is what the claimant "can still do despite his or her limitations." *Id.*

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. *Id*. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." *Id*. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." *Id*. In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's symptom-related functional limitations and restrictions can or cannot reasonably be

15

accepted as consistent with the medical or other evidence. *Id*. at *3.

**B.    RESOLUTION**

Here, the ALJ found that Plaintiff had the residual functional capacity for performing a limited range of light work. The regulations define light work as:

> . . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing-the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

Plaintiff directs the Court's attention to medical evidence which proves that he was unable to perform substantially the stand and walk requirements of light work. Plaintiff contends that the ALJ should have analyzed this case as if Plaintiff had at most, sedentary limitations.

Unquestionably, the responsibility for assessing residual functional capacity represents a single finding made by the ALJ integrating all of Plaintiff's physical, mental and other limitations. In determining residual functional capacity, the ALJ discussed Plaintiff's symptom-related functional limitations and restrictions that could reasonably be accepted as consistent with the medical or other evidence. The ALJ considered Plaintiff's X-ray of the lumbrosacral spine that was administered on August 30, 2011, and confirmed the presence of degenerative changes in L4-L5 and L5-S1 (Docket No. 13, p. 33 of 409). The ALJ also considered the MRI of Plaintiff's lumbar spine that was administered on September 10, 2011, in which it was determined that Plaintiff had a diffuse disc bulge with left far lateral bulging disc indenting the existing nerve root at L3-L4 level and a focal

16

annular tear with small central disc herniation[3] (Docket No. 13, p. 33 of 409). In particular, the ALJ noted that throughout all of his treatments and examinations, neither the treating nor the examining physicians determined that Plaintiff was unable to sit, stand or walk for prolonged periods and/or he had increased pain when he sat, stood or walked. The evidence was sketchy in this regard because the examining and treating physicians never found clinical signs of motor weakness, atrophy or loss of motor strength resulting therefrom.

The Magistrate has considered the record as a whole and finds that the ALJ appropriately accounted for specific exertional limitations resulting from a lumbar impairment that was supported by the record. Because the decision is adequately explained and supported by substantial evidence, the Magistrate recommends that the Court affirm this decision.

**II**.

Plaintiff takes issue with the ALJ's failure to seek expert medical testimony to interpret the radiographic evidence.

**A.  THE LAW.**

To obtain a disability determination at step three, a claimant must show that her impairments individually or in combination, meet or equal one of the impairments in the Listing. *See* 20 C.F.R. Pt. 404, Subpt. P, App.1 (Thomson Reuters 2014). The regulations state that an ALJ may, but is not required to, call a medical expert to address the severity of impairments and whether they meet a

---

[3] Plaintiff suggests that the ALJ also erred in failing to consider the MRI of the thoracic spine taken on March 8, 2012 (Docket No. 13, pp. 389-390 of 409). This evidence was presented to the Appeals Council which requires application of a different standard. Here, the ALJ bears the responsibility for weighing the evidence in the record and this Court may only review what was in the record at the time that the ALJ made his decision. To the extent that Plaintiff seeks an order remanding this case for the ALJ to consider this evidence in assessing residual functional capacity, the claim has been considered by the Appeals Council.

listing. 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii) (Thomson Reuters 2014). A medical expert's primary task is to explain medical problems in terms understandable to the ALJ who is a layman. *Richardson v. Perales,* 91 S.Ct. 1420, 1430-1431 (1971). Whether a claimant's impairment meets the requirements of a listed impairment is usually more a question of medical fact than opinion because most of the requirements are objective and simply a matter of documentation, but the issue is still ultimately reserved for the Commissioner. TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER, Social Security Ruling (SSR) 96–5, 1996 WL 374183, at * 3 (July 2, 1996)[4]. Thus, medical experts are most frequently used in complex medical situations. *Id*.

**B.     THE RESOLUTION.**

Plaintiff does not challenge that the radiographic evidence would have rendered his impairments capable of meeting or equaling the Listing. Rather, the basis for Plaintiff's argument is that a medical expert would have interpreted the evidence such that he would have been relegated to sedentary work and therefore under the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 201.14, rendered disabled as of his 50th birthday.

The Magistrate finds that medical expert testimony was not required in this case for three reasons. First, the ALJ exercised his discretion, deciding not to call a medical expert because his impairments neither matched nor were equivalent to the listed impairments. Second, the medical expert was not needed as the medical terms used in this case were easily understandable. Third, this case is not so complex that there were questions of medical fact or situations which required the input

---

[4] SSRs do not have the full force and effect of law but it is binding on all components of the Social Security Administration and represents precedent final opinions and orders and statements of policy and interpretations adopted by the Commissioner. 20 C.F.R. § 402.35(b)(1) (Thomson Reuters 2014).

of a medical expert.

      Plaintiff has failed to establish an adequate foundation to show that the ALJ required medical expert input to interpret the radiographic evidence. The Magistrate finds no error in the ALJ's evaluation of the radiographs.

## X. CONCLUSION

      For the foregoing reasons, the Magistrate recommends that this Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.


                                      /s/Vernelis K. Armstrong
                                      United States Magistrate Judge

Date: July 17, 2014

### XI. NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals. In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.